UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| D.W., by his mother and next friend, ) | |
| TONIA WRIGHT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:11:0064 |
| ) | Judge Sharp |
| KATHRYN O'DAY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 1983 filed by Plaintiff Tonia Wright on behalf of her thirteen year old son D.W. Plaintiff claims that D.W. was deprived of a constitutionally protected liberty interest without due process when he was placed on the child-abuse registry by the Tennessee Department of Children's Services without being provided a hearing to challenge the listing.

On February 1, 2012, this Court entered an Order and Memorandum, granting Defendants' Motion to Dismiss. In doing so, the Court found that Plaintiff had not alleged a justiciable case or controversy and, therefore, the Court did not consider Defendants' additional argument that Plaintiff had not shown the existence of a liberty interest. On March 4, 2013, the United States Court of Appeals for the Sixth Circuit reversed that decision and remanded the case with instructions that the Court "address the merits of plaintiff's claim, including the question of whether D.W. has asserted a protected liberty interest under the 'stigma-plus' test of Paul v. Davis, 424 U.S. 693, 701 (1976)." Wright v. O'Day, 706 F.3d 769, 775 (6th Cir. 2013).[1]

---

[1] The factual allegations underlying this litigation are set out in detail in this Court's prior opinion, D.W. ex rel. Wright v. O'Day, 2012 WL 315401, at **1-2, (M.D. Tenn. Feb. 1, 2012), and the Sixth Circuit's

1

The issue of whether D.W. has a protected liberty interest is presently before the Court in the context of Defendants' alternative argument in their previously filed Motion to Dismiss. For the following reasons, the Court finds that Plaintiff has stated a cognizable claim that D.W. has a protected liberty interest as required by Paul, and, as such, the Motion to Dismiss will be denied.

**I.**

Paul arose after plaintiff was arrested for shoplifting and his photograph was included by local police chiefs in a flyer of "active shoplifters" distributed to hundreds of merchants in the Louisville area. After plaintiff's employer found out about the flyer and told him that he "had not best find himself in a similar situation," Paul, 424 U.S. at 696, plaintiff filed suit under 42 U.S.C. § 1983, alleging that the police chiefs' distribution of the flyer impermissibly deprived him of his liberty interest protected by the Fourteenth Amendment insofar as the action deterred him from entering stores and could "seriously impaired his future employment opportunities." Id. at 698.

"Accepting that such consequences may flow from the flyer in question," the Supreme Court wrote, plaintiff's "complaint would appear to state a classical claim for defamation, actionable in the courts of virtually every state," id., but it did not a constitutional claim make. See, Siegert v. Gilley, 500 U.S. 226, 233 (1991) ("Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation."). Rather, there must be something more than a damage to reputation. As the Supreme Court explained:

> It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law, and we have repeatedly ruled that the

decision, familiarity with which is assumed.

> procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status. . . .
>
> In each of these cases, as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. But the interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the "liberty" or "property" recognized in those decisions. Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioners' actions. Rather his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons we hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

Paul, 424 U.S. at 711-12 (footnote omitted). Because plaintiff could not "assert denial of any right vouchsafed to him by the State and thereby protected under the Fourteenth Amendment," his constitutional claim failed, no matter how "seriously [the flyers] may have harmed [his] reputation." Id. at 712.

**II.**

Paul's holding that there must be more than a stigma to reputation has led to what is commonly-known as the "stigma-plus" test whereby "stigma alone is inadequate, but stigma plus the deprivation of other rights previously afforded by state law is sufficient" to create a constitutional cognizable liberty interest. Miskowski v Martin, 57 Fed. Appx. 246, 248 (6th Cir. 2003). The stigma-plus test has been the subject of little more than a handful of published Sixth Circuit opinions, none of which address the issue in this case. Nevertheless, the parties rely
3

primarily upon two out-of-circuit appellate opinions which lend support to their respective positions: Valmonte v. Bane, 18 F.3d 992 (2nd Cir. 1994) and Smith v. Siegelman, 322 F.3d 1290 (11th Cir. 2003). Because of the parallels and differences between both of those cases and this case, the court discusses them in some detail.

In Valmonte, plaintiff was placed on the New York State Central Register of Child Abuse and Maltreatment after she was observed slapping her child on the face and anonymously reported to the Department of Social Services. After investigating, the DSS determined that the allegation was credible and, despite the fact that the state court dismissed child protective proceedings against plaintiff, the DSS denied expungement of the record and refused to remove plaintiff's name from the register.

"The major issue" on appeal was "whether the state's maintenance of a Central Register that identifies individuals accused of child abuse or neglect, and its communication of the names of those on the list to potential employers in the child care field, implicates a protectible liberty interest under the Fourteenth Amendment." Valmonte, 18 F.3d at 994. The Second Circuit answered that issue in the affirmative, holding "that the dissemination of information from the Central Register to potential child care employers, coupled with the defamatory nature of inclusion on the list, does implicate a liberty interest." Id.

In arriving at its conclusion the Second Circuit stated that plaintiff could establish a stigma, that is, "public opprobrium" because "inclusion on the list potentially damages her reputation by branding her as a child abuser, which certainly calls into question her 'good name, reputation, honor, or integrity.'" Id. at 1000 (quoting, Board of Regents v. Roth, 408 U.S. 564, 573 (1972)). This conclusion remained even though disclosure would be only to authorized state agencies or potential

4

employers in the child care because "[d]issemination to potential employers is the precise conduct that gives rise to stigmatization." Id.

As for the remaining prong, the Second Circuit acknowledged that "'it is not entirely clear what the 'plus' is," but what is clear from Paul and other precedents is that "the deleterious effects which flow directly from a sullied reputation would normally . . . be insufficient," and this "would normally include the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation." Id. at 1001. The court then wrote:

> The instant case, however, presents an entirely different situation. [Plaintiff] alleges much more than a loss of employment flowing from the effects of simple defamation. The Central Register does not simply defame [plaintiff], it places a tangible burden on her employment prospects. [Plaintiff] has alleged that because of her inclusion on the Central Register, and because all child care providers must consult that list, she will not be able to get a job in the child-care field. In other words, by operation of law, her potential employers will be informed specifically about her inclusion on the Central Register and will therefore choose not to hire her. Moreover, if they do wish to hire her, those employers are required by law to explain the reasons why in writing.
>
> This is not just the intangible deleterious effect that flows from a bad reputation. Rather, it is a specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state. [Plaintiff] is not going to be refused employment because of her reputation; she will be refused employment simply because her inclusion on the list results in an added burden on employers who will therefore be reluctant to hire her.

Id. Ultimately, the Second Circuit held that plaintiff had "adequately stated a cause of action for deprivation of a liberty interest not merely because of the defamatory aspect of the Central Register, but because that defamation occurs in conjunction with a statutory impediment to employment." Id. at 1002.

In Smith, "the sole issue in [on] interlocutory appeal [wa]s whether nine public servants, who

5

are being sued for money damages in the individual capacities under 42 U.S.C. § 1983, are entitled to qualified immunity with respect to the claim that they violated plaintiff's Fourteenth Amendment rights by designating him a child abuser without first affording him a due process hearing." Smith, 322 F.3d at 1291. The case arose after plaintiff, a minor, was accused of sexually abusing another minor, and a county social worker, upon investigation, found it more likely than not child abuse had occurred. Counsel's subsequent request for an independent name-clearing hearing was denied, and, based upon "the administrative record review," plaintiff's name and the report were placed on Alabama's Department of Human Resources Central Registry which "is made available to persons and entities, public and private, as provided by" specific provisions of the Alabama Code. Id. at 1294.

Plaintiff sued, alleging that his Fourteenth Amendment rights were violated when his name was placed on the Registry without being provided a hearing where he could present evidence and cross-examine witnesses. Upon consideration of a motion to dismiss, the district court found that the defendants were entitled to Eleventh Amendment immunity in their official capacity, but were not entitled to qualified immunity in their individual capacity because plaintiff had "a clearly established right in not being labeled a child abuser and not having that information released to members of the public," rights that were violated when plaintiff "did not receive procedural due process." Id.

On appeal, the Eleventh Circuit "assume[d] for the sake of discussion" that some of the "defendants played a significant role in the decision to deny [plaintiff] the due process hearing he sought," and found that "the child abuse allegations here may stigmatize a person and give rise to a liberty interest." Id. at 1296. Nonetheless, the court found the "plus" prong absent, writing:

6

> The complaint does not at any point allege that [plaintiff] was denied any right or status other than his not being branded a child sexual abuser. [Plaintiff] has not contended that he was discharged, demoted, or rejected from a job due to the information on the Registry. . . . Nor has he even contended that he was passed over for promotion. . . . In short, [plaintiff] has not alleged that he has suffered any loss of employment, any diminution of salary, or anything else that "would ... qualify as 'some more tangible interest[ ],' as required by Paul."

Id. at 1297 (internal citations omitted).

In arriving at its conclusion, the Eleventh Circuit agreed with the district court that plaintiff's "employment and custody right in the future could be affected adversely due to the information on the Registry," but such "conjecture overlooks Paul's insistence that reputational damage alone is insufficient to constitute a protected liberty interest." Id. Citing Valmonte for the proposition that "the deleterious effects that flow directly from a sullied reputation, such as the adverse impact on job prospects, are normally insufficient," id., the court found that plaintiff had failed to allege the violation of a constitutional right, meaning that defendants were entitled to qualified immunity.

Facially, Valmonte and Smith may appear irreconcilable, but it may simply be that "Smith rests on a different footing." Humphries v. County of Los Angeles, 554 F.3d 1170, 2292 (9th Cir. 2009), *rev'd on other grounds*, 131 S.Ct. 447 (2010). In Humphries, the Ninth Circuit discussed both Valmonte and Smith on its way to finding that plaintiffs' due process rights were violated because there did not exist a procedural mechanism through which they could contest their inclusion on California's Child Abuse Central Index. In arriving at its decision, the Ninth Circuit found Valmonte "persuasive." As for Smith, the Ninth Circuit understood the decision to be based on the fact that potential employers are not required to consult the registry, and that "[t]he Eleventh Circuit either did not have evidence of or did not consider the possibility that as a result of the statutory framework other entities were effectively required to consult the registry as a matter of internal rule

7

or custom." Humphries, 554 F.3d 1191. Accepting that this interpretation of Smith could be wrong, the court then wrote:

> To the extent that the Eleventh Circuit refuses to recognize a liberty interest where the state functionally requires agencies to consult a stigmatizing list prior to conferring a government benefit, we must disagree. A state can alter a legal right or status without using the word "must"—the word "may" in conjunction with a rule or custom of "must" can equally deprive a citizen of a liberty interest giving rise to a procedural due process claim.

Id.

### III.

Neither Valmonte nor Smith are controlling, but, like the Ninth Circuit in Humphries, this Court finds Valmonte persuasive and, to the extent that Smith can be read as standing for the proposition that there is no denial of a liberty interest even where the state effectively requires specified employers to consider the registry, the Court respectfully disagrees with that decision. From this conclusion, it follows that Plaintiff has stated a plausible claim that D.W.'s legal rights or status have been altered by his inclusion on the registry.

According to the Complaint, child care agencies in Tennessee must conduct a background check of all prospective employees to ensure that the applicant has no criminal or abuse registry history. Any individual who applies to work at a licensed child care agency must fill out a disclosure form which is approved by the Tennessee Department of Human Services, disclose his or her status as an indicated perpetrator of abuse, and agree to release of his or her records. (Docket No. 1, Complaint ¶¶ 28-30). Similarly, any individual who applies to work with TDHS in a position likely to have significant contact with children must complete a TDHS approved disclosure form, and individuals who seek to operate a child care agency must disclose his or her status as an indicated perpetrator and agree to release of all records maintained by TDHS. (Id. ¶¶ 31 & 33).

8

Further, no person whose registry or records demonstrate that he or she is an indicated perpetrator may be employed with, be a licensee or operator of, provide substitute services to, or have any access whatsoever to children in a child care agency. (Id. ¶ 34). Similar restrictions are alleged to apply to those who seek employment in child care programs approved by the Tennessee Department of Education, including after school programs, church affiliated schools, early childhood education programs, head start, Montessori schools, and others. (Id. ¶¶ 42-47). Likewise, those seeking employment in adult daycare centers and some state agencies are subject to the same or similar restrictions. (Id. ¶48-55). Completion of the disclosure form is mandatory, and false statements on the form are a Class A misdemeanor which must be reported by the TDHS to the appropriate district attorney.

These are just some of the alleged requirements and restrictions placed upon those whose names appear in the registry, but they are more than enough to demonstrate "a statutory impediment established by the state" Valmonte, 18 F.3d at 1001 which deprives those on the registry from working in a desired field. See, Greene v. McElroy, 360 U.S. 474, 492 (1959) ("the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment"); Rowe v. Bd. of Educ. of Chattanooga, 938 S.W.2d 351, 355 (Tenn. 1996) (citation omitted) ("The concept of liberty in Fourteenth Amendment jurisprudence includes the 'liberty to engage in any of the common occupations of life.'").

On June 16, 2010, the world was D.W.'s oyster employment-wise, a world in which he had the right to pursue any of the common occupations of life, including working in Tennessee at a child care or adult care center, or operating such a center. That right was effectively lost by operation of

9

law when his name was placed on the child abuse registry the following day. See, Jamison v. State Dept. of Soc. Servs., 218 S.W.3d 399, 406 (Mo. 2007) (stigma prong met where employers and others have access to names on registry, and plus prong met where "burden placed on employers who retain or hire those listed in the Central Registry effectively precludes those listed from working in the child care profession"); Cavaretta v. Dept. of Children and Family Serv., 660 N.E.2d 250, 254 (Ill. App. 1996) ("being placed on the State register of suspected child abusers implicates a Federal liberty interest" because "[a] subject of an 'indicated' report may be prohibited from working in certain professions, such as child care and teaching.").

To be sure, it may be many years before D.W. seeks employment, and it is an open question whether D.W. will want to work in the childcare or other such regulated field. However, as the Sixth Circuit explained,

> Regardless of whether D.W. wishes to pursue future employment in the affected fields, the issue before the court is whether D.W. was afforded sufficient process in being classified as a child abuser by Children's Services. The issue is a legal one, and applying due process law to determine whether a hearing is required now will not be better informed by the vagaries of whether D.W. actually seeks certain jobs later in life.

Wright, 706 F.3d at 774. That the DCS *may* not release information regarding D.W.'s placement on the registry after two years (as the state argues) is not an answer to whether placement on the list *ab initio* without a hearing violates due process, and, in any event, ignores D.W.'s argument that placement on the registry itself is a lifelong scarlet letter because he will forever be required to report his placement on the list.

## IV.

Based upon the foregoing, and in accordance with the Sixth Circuit's instructions,

Defendants' Motion to Dismiss will be denied.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

11